UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| J.A.L. and L.L., individually and as parents of J.B.L. and C.L., minors, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 5: 22-130-DCR |
| V. | ) ) | |
| DR. CHRISTINA HOWARD, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This action, originally instituted in Fayette Family Court relates to dependency, neglect, and abuse proceedings concerning the minors J.B.L. and C.L.  Having won that case, L.L. and J.A.L., the children's mother and father, and B.P., the children's maternal grandmother, filed this action against the parties they consider responsible for their ordeal: Dr. Christina Howard and Kamika Joyner.

## I. Background

J.B.L. was born on April 3, 2020, with a head circumference in the 88th percentile for newborns.  [Record No. 6, ⁋⁋ 22-23]  His head continued to grow quickly and, by August 2020, J.B.L.'s head circumference was in the 99.8th percentile.  [*Id.* at ⁋ 23]  On August 10 and August 11, 2020, the child began to exhibit concerning symptoms, including vomiting, fever, "not acting like himself," and a twitching right leg.  [*Id.* at ⁋ 29]  His mother, L.L., contacted the family's pediatrician, Dr. Shawn Taylor, who directed her to take J.B.L. to the University of Kentucky Emergency Department.  L.L. complied with this direction.  [*Id.* at ⁋⁋ 30]

An August 12, 2020, MRI revealed that the child had experienced a subdural hematoma, and an ophthalmological consult on the same day showed bilateral bleeding.  [*Id.* at ⁋ 31]  The University of Kentucky Medical Center referred J.B.L.'s injury to its Division of Pediatric Forensic Medicine for a non-accidental trauma work-up pursuant to its policy for infants under the age of twelve months who experience head trauma.  [*Id.* at ⁋ 32]

The Division of Pediatric Forensic Medicine receives grant funding from the Kentucky Department of Health, Kosair Charities, and the Victims of Crime Act, of which "approximately $150,000.00 [is] paid annually to Dr. Howard."  [*Id.* at ⁋⁋ 18-19]  The plaintiffs allege that Howard has "a financial and personal self-interest . . . in applying a standard that results in the reporting of an increased number of substantiated child abuse cases" so that she can secure additional grant funding for the Division.  [*Id.* at ⁋⁋ 20-21]

Howard and Stephanie Smith performed the work-up for J.B.L. with the help of a licensed clinical social worker.  [*Id.* at ⁋ 33]  The social worker interviewed L.L. and J.A.L., J.B.L.'s father, on August 12.  Both parents "denied a history of threats, violence, prior arrests, legal issues, and harm to or mistreatment of children."  [*Id.* at ⁋ 36]  And the social worker found that the parents were "appropriate and cooperative throughout the interview."[1]  [*Id.*]  Howard herself did not meet with the parents and did not personally examine J.B.L. or his sister, C.L.  [*Id.* at ⁋⁋ 37-38]

The work-up documented the following evidence that the plaintiffs characterize as "overwhelmingly inconsistent with abuse": (a) "nine (9) color photographs of J.B.L., none of

---

[1]  This social worker goes unnamed in the plaintiffs' Amended Complaint, and the pleading does not particularly suggest that it was Joyner.

which showed any signs consistent with abuse"; (b) a Pediatric Trauma Survey performed on August 12, 2020, showing "no acute or healing or healed fracture of complete skeletal survey"; (c) an August 12, 2020, MRI showing "[m]ildly to moderately enlarged lateral and third ventricles and enlarged subarachnoid spaces in the temporal and frontal regions despite the presences of bilateral subdural collections," which "could be seen in the presence of underlying communicating hydrocephalus, and there could also be a component of benign enlarged subarachnoid spaces of infancy (BESS)"; and (d) bleeding labs (Factor 8, Factor 9, Von Willebrand antigen and Von Willebrand Ristocetin CoFactor) "within normal limits." [*Id.* at ⁋ 39]

BESS "is a relatively rare neurological disorder, which can produce bleeding in the brain (or . . . subdural hematoma) spontaneously or during ordinary care of [an] infant" and "can also produce residual retinal bleeding" with the associated subdural hematomas. [*Id.* at ⁋ 25] BESS is a hereditary condition, and the plaintiffs indicate that the child's father and sister both had "larger-than-typical heads during infancy." [*Id.* at ⁋ 27-28]

Following the work-up, the parents sought a second opinion from the Cincinnati Children's Hospital, which conducted an MRI. [*Id.* at ⁋ 40] "A review of the MRI report . . . also noted that the MRI findings could be 'correlated with head circumference,' an indicator of BESS and a benign explanation inconsistent with physical abuse by the parents." [*Id.*] Howard determined that she "could not rule out abuse" for J.B.L.'s injury, notwithstanding the potential for a BESS diagnosis. [*Id.* at ⁋ 41]

The plaintiffs state that:

> [b]etween August 12, 2020 and June 15, 2021, Defendant Howard was
> presented with no less than 5 other medical expert opinions, all of which refuted
> her claim, and all of which she ignored. These experts included a board-certified
> child abuse pediatrician (CAP), an ophthalmologist, a board-certified
> pediatrician and child neurologist, J.B.L. and C.L.'s pediatrician, as well as a
> licensed clinical psychologist who compiled extensive reports on both J.A.L.
> (father) and L.L. (mother).

[*Id.* at ℙ 42]

Joyner is a social service worker and employee of the Department for Community

Based Services ("DCBS"), a division of the Kentucky Cabinet for Health and Family Services.

[*Id.* at ℙ 17; Record No. 10-1]  She and the children's parents signed an August 14, 2020, safety

plan, which has been produced by Joyner.  [Record No. 10-1]  The safety plan provided that

the paternal grandparents would care for the children, subject to visits supervised by DCBS

personnel.  [*See id.*]  The safety plan states "[t]he undersigned understand that this document

is not a court order.  It is a voluntary agreement between the signed parties."  [*Id.*]  It further

indicates that the agreement "may be revoked at any time."  [*Id.*]  The plaintiffs allege that

Joyner coerced them into signing the safety plan, threatening them "with the prospect that

J.B.L. and C.L. might become wards of the state in a foster care home in the event that the

Parents and Maternal Grandmother did not agree to the placement . . . ." [Record No. 6, ℙ 53]

Joyner initiated the removal proceedings (Case Numbers 20-J-674-001 and 20-J-675-

001) on August 19, 2020, seeking court intervention to remove both J.B.L. and C.L. from the

custody of J.A.L., L.L., and B.P., the maternal grandmother who had some contact with J.B.L.,

during the period in question.  [*Id.* at ℙℙ 36, 40, Record No. 10-2, pp. 1-2]  Joyner's petitions

initiating these actions alleged that the University of Kentucky had informed her that J.B.L.'s

injuries were "the result of abusive head trauma," C.L. was "at risk" due to the "uncertain

circumstances and severity" of her brother's injury, and both J.B.L. and C.L. were neglected children. [Record Nos. 6, ¶ 44, and 4-2, pp. 4, 8]  The petitions sought to place the children in the temporary custody of their paternal grandparents while the removal proceedings were ongoing, with the parents having only supervised contact. [Record No. 4-2, pp. 4, 8]

Howard participated in the removal proceedings, issuing a forensic medicine consult report on January 13, 2021, that "included no discussion of the basis for [her] decision to disregard BESS as a possible explanation for the subdural hematoma J.B.L. had suffered." [Record No. 6, ¶ 69] The doctor was deposed on March 3, 2021, testifying that this was "likely a case of abusive head trauma" because "[t]here was no history of trauma provided to our team . . . no sign of metabolic disease, no sign of a bleeding disorder or anything like that." [*Id.* at ¶ 73] Howard additionally noted that "if there's absolutely no history of accidents . . . your conclusion then is [that the injury was] non-accidental." [*Id.*]

When asked about a potential BESS diagnosis, Howard "relied on her own personal measurements" to claim that J.B.L. did not truly have an enlarged subarachnoid space, which contradicted the August 12, 2020, MRI reading discussed above. [*Id.* at ¶ 75] The plaintiffs insinuate that Howard was unqualified to issue this post-hoc opinion because she is not a trained radiologist or neurologist. [*Id.* at ¶¶ 75-76] Her measurements were "also grossly inaccurate" and "later refuted by a board-certified pediatrician and neurologist." [*Id.* at ¶ 77] The plaintiffs allege that Howard "did not rule out BESS during her differential diagnosis, but instead intentionally chose to disregard the BESS as a possible, non-abusive mechanism of J.B.L.'s subdural hematoma. . . ." [*Id.* at ¶ 78]

The removal proceedings were dismissed by Judge Lucinda Masterton on June 15, 2021. [*Id.* at ¶ 81]  Judge Masterton "apologized profusely to the family on the record for the handling of the case." [*Id.*]

The plaintiffs filed a Verified Complaint on May 20, 2022, and a First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) on July 6, 2022. [Record Nos. 1, 6]  In their Amended Complaint, the plaintiffs assert four § 1983 claims against Howard and Joyner.  First, the parents and maternal grandmother assert a malicious prosecution claim (Count I) under the Fourth Amendment.  [Record No. 6, ¶¶ 82-88]  Next, the parents and maternal grandmother assert a due process claim (Count II), alleging that the defendants "conducted a reckless investigation, deliberately disregarded exculpatory evidence regarding benign, non-abusive explanations for J.B.L.'s medical condition, and deliberately fabricated false and/or misleading reports and statements to the [Fayette Family] Court."  [*Id.* at ¶ 90]  They contend that, "[a]bsent this misconduct, the prosecution of the Natural Parents and Maternal Grandmother could not and would not have been pursued." [*Id.*]  Next, the plaintiffs assert a Fourth Amendment unlawful seizure claim on behalf of J.B.L. and C.L. (Count III), contending that without the defendants' alleged misconduct, the children "would not have been removed from their Parents' custody for nearly a year."  [*Id.* at ¶ 95]  Finally, all plaintiffs allege in Count IV that the defendants violated their right to "familial association" under the Fourteenth Amendment when they caused the children to be removed "in the absence of imminent risk of serious bodily injury to J.B.L. or C.L., consent, or exigent circumstances, justifying such removal."  [*Id.* at ¶ 100]

## II.  Legal Standard

Federal pleading standards require "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Dismissal in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure is appropriate where a party fails to "state a claim upon which relief can be granted."

In reviewing a motion to dismiss, the Court must accept all "well-pleaded factual allegations" as true and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  But a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, a complaint must "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 570).  This standard requires "either 'direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'"  *Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014)).  Dismissal is warranted when this standard is not satisfied.

"Assessment of the facial sufficiency of the complaint must ordinarily be undertaken without resort to matters outside the pleadings."  *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011) (citing *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010)).  Examination of matters outside the pleadings generally requires conversion of a motion to dismiss to a Rule 56 motion for summary judgment.  *Id.*  "However, a court may consider . . . 'public records . . . and exhibits attached to [a] defendant's motion to dismiss

so long as they are referred to in the complaint and are central to the claims contained therein,' without converting the motion to one for summary judgment." *Id.* at 680-81 (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

Here, Joyner has provided several public records from the removal proceedings that may be considered without converting the motions to dismiss to motions for summary judgment, including: the petitions that initiated the removal proceedings, dated August 24 and August 27, 2020, the August 14, 2020 safety plan, temporary removal and temporary custody orders, and a court order returning the children to their parents on March 26, 2021.  [Record Nos. 4-2, 10-1, 10-2, 10-3, 10-4]  The plaintiffs refer to each of these attachments in the Amended Complaint, and all are central to their claims.  [Record No. 6, ¶¶ 44, 54-55, 82]

### III.  Discussion

### A.  Joyner's Motion to Dismiss: Absolute Immunity

Joyner argues that she is entitled to absolute immunity on the claims asserted against her because the factual allegations in the Verified Complaint address her conduct as a legal advocate.  [Record No. 4, pp. 15-16]  "[S]ocial workers are absolutely immune only when they are acting in their capacity as legal advocates—initiating court actions or testifying under oath—not when they are performing administrative, investigative, or other functions." *Kovacic v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 694 (6th Cir. 2013) (emphasis omitted) (quoting *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 724 (6th Cir. 2011)).  In other words, a social worker is entitled to absolute immunity if the specific conduct at issue was "prosecutorial in nature," even if the underlying case is a civil proceeding relating to alleged child abuse or neglect.  *Id.*

When applicable, absolute immunity "provides a shield from liability for acts performed erroneously, even if alleged to have been done maliciously or corruptly." *Id.*; *accord Turner v. Lowen*, 823 F. App'x 311, 317 (6th Cir. 2020) (observing that "[t]he scope of immunity enjoyed by social workers is remarkably broad" in that it covers knowing and intentional misrepresentations). "The official seeking absolute immunity bears the burden of showing that immunity is justified in light of the function she was performing." *Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).

The Amended Complaint in the present case alleges that Joyner: (1) initiated the removal proceedings on August 19, 2020; (2) signed the petitions initiating the proceedings that included contested allegations of J.B.L.'s abuse and potential danger to C.L.; (3) "actively participated in . . . the Removal Proceedings throughout the entire process"; (4) threatened the adult plaintiffs that their children "might become wards of the state in a foster care home in the event that [the parents] did not agree to the placement of J.B.L. and C.L. with their paternal grandparents"; and (5) generally took actions that "resulted in legal proceedings that that lasted nearly a year, that cost the Plaintiffs hundreds of thousands of dollars, and that resulted in [both] J.B.L. [and C.L.] being physically separated from and outside the custody of their Parents for an extended period of time." [Record No. 6, ¶¶ 43-45, 51, 53-54, 80] Applying the standards for absolute immunity here substantially narrows the scope of potentially plausible claims asserted against Joyner.

A majority of the conduct listed above clearly relates to Joyner's role as a legal advocate in initiating and litigating the removal proceedings. Specifically, Count I's malicious prosecution claim entirely concerns the allegedly unlawful decision to initiate and litigate the

removal proceedings.   [Record No. 6, ¶¶ 82-88]   And Counts II and III allege that the defendants' reckless investigation, deliberate disregard of exculpatory evidence, and false statements and reports to the Fayette Family Court deprived the adult plaintiffs of their Fourteenth Amendment due process rights (Count II) and the minor plaintiffs of their Fourth Amendment right to be free from unlawful seizure (Count III).   [*Id.* at ¶¶ 90-91, 94-96]   Finally, in Count IV, the plaintiffs object to the defendants' "unlawful, warrantless removal" of the children without proper justification.   [*Id.* at ¶ 100]

As explained above, it does not matter whether Joyner made false statements to the court because she has absolute immunity for her conduct as a legal advocate.   Additionally, the Amended Complaint's factual allegations relating to the investigation of alternative explanations for J.B.L.'s condition all concern Howard, not Joyner.   Only the allegation that Joyner threatened the plaintiffs to sign the safety plan would not yield absolute immunity, to the extent it supports the claim that she engaged in a "reckless investigation."   [*Id.* ¶¶ 90, 94][2]

Joyner's claim for immunity fails with respect to the safety plan because the plan was wholly unrelated to her conduct as an advocate before Fayette Family Court.   The safety plan was a private agreement between DCBS and the plaintiffs that was entered into prior to, and enforced separately from, the removal proceedings. [3]   [Record Nos. 6, ¶¶ 53-55, and 10-1]

---

[2]  The Amended Complaint also contains an assertion that Joyner "lacked reasonable probable cause to make the foregoing allegations [in the petitions] and to initiate the Removal Proceedings."   [Record No. 6, ¶ 47]   Notwithstanding that this allegation also relates to the defendant's initiation of the removal proceedings, it is a legal conclusion that "must be," but is not, "supported by factual allegations" relating to Joyner's conduct. *Iqbal*, 556 U.S. at 679.

[3]  As the plaintiffs acknowledge, the safety plan states that it is "a voluntary agreement between the signed parties" that automatically terminates after 14 days. [*See* Record Nos. 6, ¶ 54 and 10-1]   According to DCBS regulations, such safety plans are entirely separate from removal

Moreover, Joyner has failed to provide any facts suggesting that her conduct regarding the plan was prosecutorial in nature.  As such, any of Joyner's alleged actions surrounding the plan more closely resemble investigative acts that are not protected by absolute immunity.  *See*, *e.g.*, *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 421 (6th Cir. 2001) ("The investigation of a social worker that precedes the filing of a complaint or petition is not necessarily a judicial act covered by absolute immunity.") (citing *Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989).

But aside from this conclusion, the plaintiffs' claims involving the safety plan will be dismissed as insufficiently pleaded.  *See Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").  "Vague allegations that one or more of the defendants acted wrongfully or violated the plaintiff[s'] constitutional rights are not sufficient" to state a plausible claim for relief under § 1983.  *Douglas v. Greenup Cnty.*, No. 19-cv-114, 2019 WL 6794185, at *2 (E.D. Ky. Dec. 12, 2019) (quoting *Laster v. Pramstaller*, No. 08-cv-10898, 2008 WL 1901250, at *2 (E.D. Mich. Apr. 25, 2008)).

The Amended Complaint fails to allege that any of Joyner's statements or conduct rendered their acceptance of the safety plan involuntary.  And Joyner's accurate statement that the children could be placed in foster care does not constitute an improper threat.  *See Schantilly v. Daugharty*, 656 F. App'x 123, 129 (6th Cir. 2016) "[O]fficials do not violate

---

proceedings and have no bearing on the family court's custody determination. *See* Dep't for Cmty. Based Servs. 7.2, Child Protective Services Safety Planning (2020), https://manuals-sp-chfs.ky.gov/chapter7/Pages/7-2.aspx ("[T]he safety plan . . . [d]oes not substitute for filing a petition with the juvenile/family court when there are long-term protection needs.").

clearly established . . . Fourteenth Amendment rights by threatening removal proceedings in order to secure parents' consent to the temporary placement of their children."); *see also Smith v. Williams-Ash*, 520 F.3d 599, 600 (6th Cir. 2008); *Dupuy v. Samuels*, 465 F.3d 757, 762 (7th Cir. 2006) ("It is not a forbidden means of coercing a settlement to threaten merely to enforce one's legal rights").   Because the plaintiffs have not alleged any facts supporting their conclusion that Joyner coerced them into signing the safety plan, any remaining claims against Joyner will be dismissed.

In summary, the allegations made against Joyner that relate to her role as an advocate in the removal proceedings are barred by absolute immunity. And the allegations that she engaged in coercive conduct are not "well-pleaded factual allegations" that plausibly give rise to relief. *Iqbal*, 556 U.S. at 679.  As a result, all claims against Joyner will be dismissed.[4]

## B.  Howard & Joyner's Motions to Dismiss: "Fourth Amendment – Malicious Prosecution": Failure to State a Claim

Additionally, both Joyner and Howard argue that Count I (the "Fourth Amendment – Malicious Prosecution" claim brought by the parents and maternal grandmother) should be dismissed because the plaintiffs were not subjected to a criminal prosecution.  [Record Nos. 10, pp. 4-5, and 11, pp. 10-13]  The United States Court of Appeals for the Sixth Circuit has stated that plaintiffs must prove the following elements to establish a Fourth Amendment malicious prosecution claim brought under § 1983:

(1) a *criminal prosecution* was initiated against them and the defendants made, influenced, or participated in the decision to prosecute; (2) there was no

---

[4]  Given that all claims against Joyner are dismissed on grounds of absolute immunity, it is not necessary to address her other arguments.  However, the following discussion provides alternative bases for granting Joyner's motion to dismiss.

probable cause for the *criminal prosecution*; (3) as a consequence of the legal proceeding, the plaintiffs suffered a deprivation of liberty under the Fourth Amendment, apart from the initial seizure; and (4) the *criminal proceeding* was resolved in the plaintiffs' favor.

*Garner v. Harrod*, 656 F. App'x 755, 758 (6th Cir. 2016) (emphases added and omitted) (citing *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).

In *Turner v. Lowen*, the plaintiff parents asserted a similar malicious prosecution claim against a doctor who reported suspected child abuse and a Tennessee Department of Child Services investigator. No. 3:18-cv-00721, 2019 WL 4820519, at *1-2, 11-12 (M.D. Tenn. Oct. 1, 2019), *aff'd*, 823 F. App'x 311 (6th Cir. 2020). But as is the case here, the parents in *Turner* provided no authority to suggest that noncriminal legal proceedings may serve as a basis for a malicious prosecution claim, and the court dismissed the claim because the relevant case law "support[ed] the precisely opposite conclusion." *Id.* at *12 (collecting cases). Count I of the plaintiffs' Amended Complaint is subject to dismissal for the same reason.

Here, the removal proceedings were plainly civil actions, not criminal prosecutions. *See C.H. v. Cabinet for Health & Fam. Servs.*, No. 2015-CA-000098-ME, 2016 WL 1069037, at *5 and n.5 (Ky. Ct. App. Mar. 18, 2016). Indeed, as Howard observes, Kentucky law requires that, "where criminal charges arising out of the same transaction or occurrence are filed against an adult alleged to be the perpetrator of child abuse or neglect," those criminal charges must be tried separately from a hearing adjudicating child dependency, abuse, or neglect petitions. [Record No. 11, pp. 11-12 (citing KRS § 620.120)] There is no serious argument that any portion of the removal proceedings was criminal in nature, and Count I accordingly fails to state a claim for relief against either defendant.

### C.  Howard & Joyner's Motions to Dismiss: Qualified Immunity

Both defendants also contend that they are entitled to the protections of qualified immunity regarding all counts.  [Record Nos. 10, pp. 18-20, 11, pp. 21-24]  The plaintiffs "bear[] the burden of showing that defendants are not entitled to qualified immunity," which can be done by showing "both (1) that the defendant violated a constitutional right, and (2) that the right was clearly established."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Qualified immunity can be overcome at the pleading stage by "alleging facts plausibly making out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable [official] would have known that his conduct violated that right."  *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citations omitted).  Additionally, the Sixth Circuit has noted that, "at the pleading stage, we have historically found that the inquiry should be limited to the 'clearly established' prong of the analysis if feasible."  *See Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021) (citing *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015); *Lyons v. City of Xenia*, 417 F.3d 565, 582 (6th Cir. 2005) (Sutton, J., concurring)).  Whether a right is clearly established is determined "in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201) (2001)).

### i.  The Adults' Malicious Prosecution Claim

Dismissal of the plaintiffs' malicious prosecution claim is appropriate on qualified immunity grounds because the plaintiffs have not shown that it was clearly established that such a violation could occur where the underlying state court proceeding did not involve a criminal prosecution.  *Turner v. Lowen*, No. 3:18-cv-00721, 2019 WL 4820519, at *12 (M.D.

Tenn. Oct. 1, 2019).  As the district court explained in *Turner*, even if malicious prosecution outside of the context of criminal proceedings was cognizable as a claim under § 1983, "such 'malicious prosecution' would not have been a clearly established constitutional violation at the time at issue." *Id.*

### ii.  The Plaintiffs' Fourteenth Amendment Claims

The defendants would also be entitled to qualified immunity with respect to the plaintiffs' Fourteenth Amendment claims.  In Count II, the Parents and Maternal Grandmother assert that the defendants' reckless conduct led to the unlawful removal proceedings brought against them in Fayette Family Court.  [Record No. 6, ₧ 90]  But the Amended Complaint does not specify whether the plaintiffs assert a procedural or a substantive due process claim.  However, in their Reply to the Defendants' Motions to Dismiss, the plaintiffs state that they allege only that the defendants' conduct violated their substantive due process rights.  [Record No. 12, pp. 21-22]  All plaintiffs allege another Fourteenth Amendment violation in Count IV, in which they claim that the defendants' actions violated their "constitutional rights to familial association pursuant to the 14th Amendment" based on the allegedly unlawful removal of J.B.L. and C.L.  [Record No. 6, ₧ 100]

Under the Fourteenth Amendment, substantive due process violations can take the form of either "(1) deprivations of a particular constitutional guarantee" or "(2) actions that 'shock the conscience.'"  *Pittman*, 640 F.3d at 728.  To successfully state a claim in the former category, a plaintiff must show both "a deprivation of a constitutionally protected liberty interest" and that "the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 756-66 (6th Cir. 2020)

(cleaned up). Here, the plaintiffs claim that the defendants' actions violated their "fundamental and long-established liberty interest in the care and custody of their children . . . ." [Record No. 6, ⁋ 86]

As an initial matter, any claims regarding the initial removal of the children must be dismissed. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *see also Bell v. Johnson*, 308 F.3d 594, 610 ("The validity of [a § 1983 claim] must . . . be judged by reference to the specific constitutional standard which governs that right.") (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). Here, the allegedly unlawful seizure of J.B.L. and C.L. from their parents' home is most appropriately governed by the children's Fourth Amendment unlawful seizure claim. To the extent the children's catchall Fourteenth Amendment claim involves their seizure, any such claim would be dismissed.

Both defendants argue that their conduct did not violate the plaintiffs' due process rights because the state courts were ultimately responsible for removing J.B.L. and C.L. from their parents' custody. [Record Nos. 10, pp. 6-7, and 11, p. 24] The Sixth Circuit addressed a similar argument in *Clark v. Stone*, 998 F.3d 287, 299 (6th Cir. 2021). There, social workers reported the parents' use of corporal punishment as suspected child abuse, which led to a juvenile court removing their children for almost eight months. *Id.* at 292-94. The social workers argued that they were not liable for the children's removal under *Pittman v. Cuyahoga County Department of Child and Family Services*, which held that "where the juvenile court

has the ultimate authority to do something, social workers cannot be sued for substantive due process harms because the court, not the social workers, is the cause of the harms." *Id.* at 299 (*citing* 640 F.3d at 728-29).

The *Stone* court rejected the social workers' arguments, although recognizing an exception to *Pittman*'s rule when the plaintiff alleges that defendants presented their investigation to the juvenile court in bad faith. *Id.* Because the plaintiffs had sufficiently pleaded a "bad faith child-services investigation," the court denied the defendants qualified immunity under the first prong of the analysis. *Id.* (citing *Heithcock v. Tenn. Dep't of Childs. Servs.*, No. 3:14-cv-02377, 2018 WL 1399586, at *6 (M.D. Tenn. Mar. 20, 2018)); *see also Teets v. Cuyahoga Cnty.*, 460 F. App'x 498, 502 (6th Cir. 2012) ("Absent evidence of bad faith, improper motive, or investigation tactics that 'shock the conscience,' such [governmental investigation into allegations of child abuse] will not infringe on a family's fundamental rights.") (citing *Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006)).

Based on the same reasoning, Howard's argument that she was not responsible for J.B.L. and C.L.'s removal must be rejected. Howard rightly asserts that "Kentucky's state courts have final decision-making authority regarding child custody." [Record No. 11, p. 24]; *see also* KRS §§ 620.060, 620.090. But the Sixth Circuit has repeatedly recognized that state actors can be held liable for their part in initiating removal proceedings under the Fourteenth Amendment if the plaintiff alleges a bad-faith investigation. [Record No. 11, p. 24]; *Clark*, 998 F.3d at 299; *Teets*, 460 F. App'x at 502; *Pittman*, 640 F.3d at 728-29. And the plaintiffs have made such allegations in this case. More specifically, they allege that Howard acted with a "financial and personal self interest [in] applying a standard that results in the reporting of

an increased number of substantiated child abuse cases" so that she can secure additional grant funding.  [Record No. 6, ¶¶ 18-21]  This allegation of bad faith is sufficient to survive the first step of the qualified immunity analysis regarding their claim that Howard's actions in the removal proceedings violated their rights under the Fourteenth Amendment.  *See Clark*, 998 F.3d at 299.

By contrast, the plaintiffs did not include any factual allegations suggesting that Joyner acted in bad faith, apart from their legal assertions that she "lacked reasonable probable cause" to initiate proceedings and "threatened" them to sign the safety plan.  [Record No. 6, ¶ 47]  Aside from those conclusory contentions, they have not made a showing of any improper motive that would remove her from *Pittman*'s protection.  640 F.3d at 729 ("[A social worker's custody] determination is not binding on interested parties, including the parents, until the juvenile court approves and journalizes the child's case plan.").  While the plaintiffs' claims overcome the "initial hurdle" of alleging a constitutional violation against Howard, their claims against Joyner do not.

Under the second prong of the qualified immunity analysis, the plaintiffs have failed to show that the rights at issue are clearly established.  With respect to both Fourteenth Amendment claims, the plaintiffs assert that "the right to conceive and to raise one's children has been clearly established as an essential constitutional right since at least 1923, and the specific right of a parent in the companionship, care, custody, and management of his or her children has been clearly established since 1972."  [Record No. 6, ¶ 60]  This assertion is well-taken.  In fact, the Sixth Circuit has recognized that "[t]here is no doubt that under the constitution, the parent-child relationship gives rise to a liberty interest that a parent may not

be deprived of absent due process of law." *Kottmyer v. Mass*, 436 F.3d 684, 689 (6th Cir. 2006).

However, even in light of this recognition, "the right to family integrity, while critically important, is neither absolute nor unqualified." *Id.* at 690 (citing *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994)). And while there is no need to find a case directly on point to overcome the defense of qualified immunity, a plaintiff must at least show that the law at the time "clearly prohibited the [actor's] conduct in the particular circumstances before him." *Williams v. Maurer*, 9 F.4th 416, 437 (6th Cir. 2021) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)). The plaintiffs have not done so here.

Here, the Amended Complaint alludes to *Meyer v. State of Nebraska,* 262 U.S. 390 (1923) and *Eisenstadt v. Baird*, 405 U.S. 438 (1972), as precedent that clearly establishes their Fourteenth Amendment rights to due process and familial integrity. [Record No. 6, ⁋ 60] But those cases are a far cry from the instant case: *Meyer* affirmed parents' right to educate their children in languages other than English, while *Eisenstadt* recognized the rights of unmarried couples to access contraception. *Meyer*, 262 U.S. at 400-01; *Eisenstadt*, 405 U.S. at 443-46. But merely asserting a generalized right to care for their children does not constitute a sufficient showing that the Fourteenth Amendment protects them from Howard's alleged conduct.

Even if the plaintiffs had provided more specific support, case law from the Sixth Circuit suggests that Howard's alleged actions do not violate clearly established Fourteenth Amendment rights. The undersigned has failed to locate any cases suggesting that Howard's decision to file an incomplete report (even if done maliciously) constitutes a due process

- 19 -

violation. Indeed, case law from this Circuit suggests that Howard's refusal to address alternative explanations for J.B.L.'s condition in her reports would *not* violate the Fourteenth Amendment's guarantee of substantive due process. *Turner v. Lowen*, 2019 WL 4820519, at *13 (recognizing that while "the failure to disclose material information is a due process violation" in the criminal context under *Brady v. Maryland*, 373 U.S. 83 (1963), "existing authority declines to extend *Brady* to civil cases") (citing *Cleary v. Cnty. of Macomb*, No. 6-15505, 2007 WL 2669102, at *17 (E.D. Mich. Sept. 6, 2007), *aff'd*, 409 F. App'x 890 (6th Cir. 2011) ("[T]his Court does not believe that Wolf, a social worker who was not retained by the police of prosecution (and thus not a 'police investigator') can be held liable for a *Brady* violation.").

Similarly, no cases from this circuit suggest that a physician's child abuse investigation, even if conducted recklessly or in bad faith, violates a clearly established right to family integrity under the Fourteenth Amendment. *See Kottymer v. Maas*, 436 F.3d at 691 ("[T]he right to familial association is not implicated merely by governmental investigation into allegations of child abuse."). In *Heithcock v. Tennessee Department of Children's Services*, the Sixth Circuit recognized that a social worker violated the plaintiff's rights to familial association when she filed bad-faith reports to a juvenile court during removal proceedings. No. 15-6236, 2016 WL 11786416, at *4 (6th Cir. Oct. 4, 2016). But that action involved a social worker whose reports to the court were wholly unsubstantiated. *Id.* at *1. By contrast, Howard relied on J.B.L.'s MRI findings when she reported suspected abuse. [Record No. 6, ¶¶ 40-41] Her interpretation of J.B.L.'s condition appears to have been erroneous, but her report was nonetheless supported by some evidence. Moreover, the defendant in *Heithcock*

was a social worker, not a doctor.  2016 WL 11786416, at *1.  As such, to the extent a bad-faith investigation violates the plaintiffs' rights to familial association, those rights may be clearly established with respect to a social worker's actions, but they have never been applied to a doctor's conduct.

In summary, even if Howard's investigation violated the Fourteenth Amendment, the plaintiffs have failed to cite any authority suggesting that "existing precedent 'has placed the . . . constitutional question beyond debate" of whether their Fourteenth Amendment rights were clearly established.  *Schulkers v. Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)).  As a consequence, Howard and Joyner are entitled to qualified immunity regarding both counts.

### iii.  The Minors' Fourth Amendment Claim

Count III contains assertions that the defendants' reckless investigation, disregard of exculpatory evidence, and false statements to the Court during removal proceedings caused J.B.L. and C.L. to be unlawfully seized from their parents.  [Record No. 6, ¶¶ 94-95]  Howard disputes these allegations, arguing that a physician does not violate an individual's clearly established rights under the Fourth Amendment by reporting suspected child abuse.  [Record No. 11, pp. 18-19]  Both defendants maintain that they are not the proper defendants for a Fourth Amendment claim, as the "power to remove a child from his or her parents' custody . . . rests with the state courts."  [*See* Record Nos. 10, p. 20, and 11, pp. 18-19.]

The plaintiffs have not demonstrated that Howard and Joyner have violated clearly established Fourth Amendment rights.  The plaintiffs claim that "[t]he applicability of the Fourth Amendment to the removal of a child from his or her home has been well-established

- 21 -

in the Sixth Circuit since at least 2013." [Record No. 12, p. 24] They argue that the defendants should have known that the Fourth Amendment applied to their actions in light of *Kovacic v. Cuyahoga County Department of Children and Family Services,* 724 F.3d 687 (6th Cir. 2013), and, therefore, their rights against unlawful seizure were clearly established. [*Id.* at 25]

In *Kovacic*, the plaintiff claimed that social workers who removed her children from her home without a warrant committed an unlawful seizure under the Fourth Amendment. 724 F.3d at 698. The Sixth Circuit recognized that all state officers should "operate with the default understanding that the Fourth Amendment applies to [their] actions." *Id.* at 698 (citing *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir. 2012)). Regarding the social workers' conduct in that case, the Court held that "seiz[ing] children from their homes without a warrant or exigent circumstances" violated clear Fourth Amendment principles. *Id.* at 699.

While *Kovacic* establishes the general proposition that state actors are subject to the Fourth Amendment, its holding is distinguishable from the facts of this case. In *Kovacic*, social workers removed children without a warrant or court order. *Id.* at 692. Here, by contrast, the defendants neither issued the court order authorizing J.B.L. and C.L.'s removal nor entered the plaintiff's home to remove the children. The plaintiffs claim that Howard and Joyner "lacked reasonable probable cause" in reporting their suspected abuse to authorities, but their reports are separate from their role in executing the removal. As such, to the extent that *Kovacic* outlines clearly established Fourth Amendment principles, they are largely inapplicable to the facts of this case.

Howard, on the other hand, claims that *Turner v. Lowen*, 823 F. App'x 311 (6th Cir. 2020), controls. [Record No. 10, p. 23] In *Turner*, two children were removed from their

parents custody after doctors at the Vanderbilt University Medical Center erroneously determined that the children were at risk of abuse. *Id.* at 314. The children sued the social workers under the Fourth Amendment for entering a removal order based on "inaccurate or incomplete information." *Turner*, 2019 WL 4820519, at *7, *aff'd*, *Id.* The parents also sued the pediatrician who reported the suspected abuse for failing to adequately investigate their case and withholding "exculpatory medical information" from the juvenile court, including dismissing "possible alternative interpretations of [the child's] lab results and medical history" as "implausible." 823 F. App'x at 315-16.

The district court in *Turner* held that the social workers' reliance on the pediatrician's report when entering their removal order did not violate clearly established law. 2019 WL 4820519, at *8. The court recognized that the holding in *Brent v. Wayne County Department of Human Services* established that a social worker would violate the Fourth Amendment by submitting false statements in support of a petition for removal. *Id.* (citing 901 F.3d 656 (6th Cir. 2018)) But the court distinguished *Brent* from the facts of instant case, holding that, while a removal order that contained "falsehoods" would be a clearly established violation, an order that contained "omissions of facts (in this case, omitting evidence of other possible medical causes of [the plaintiff's] injuries)" would not. *Id.* In the same way, a claim that Joyner *falsified* information in her petition for removal would be a clearly established violation, but the claim that she *omitted* information would not suffice. In short, Joyner did not violate clearly established law by relying on Howard's report.

Regarding the plaintiffs' claims against the physician in *Turner*, the Sixth Circuit affirmed the district court's finding that the plaintiffs had no "clearly established Fourth

Amendment right to be free from removal pursuant to an order obtained via knowingly false or incomplete information." 823 F. App'x at 318. The court recognized that it had never clearly held that "a physician who makes false or reckless statements in support of a petition for removal" violated the Fourth Amendment, and so the doctor was entitled to qualified immunity. *Id.* at 319; *see also Turner*, 2019 WL 4820519, at *10 ("There is simply no clearly established law that a physician reporting suspected child abuse . . . violates the Fourth Amendment by failing to include 'possible medical conditions that could mimic child abuse by manifesting with the same or similar injuries to the child' in the information supplied to a state children's services agency.")

*Turner* was affirmed by the Sixth Circuit in July of 2020, just days before the incidents giving rise to this case occurred. The plaintiffs have not cited (and this Court has not located) any cases stating that the court's conclusion in *Turner* has since changed. Just as the *Turner* court found that a doctor's incomplete investigation and withholding exculpatory information did not violate clearly established Fourth Amendment rights (even if done recklessly), this Court draws the same conclusion with respect to Howard's actions.[5]

_____

[5] Howard also argues that because Kentucky law requires her to file a report when she has "reasonable cause to believe" that child abuse has occurred, the plaintiffs have no clearly established right to be protected from such a report, even if filed with incomplete information. [Record No. 11, pp. 8-9 (citing KRS § 620.030)] But that statute recognizes an exception for immunity when a report is made in bad faith, which the plaintiffs have pleaded here. *See Hazlett v. Evans*, 943 F.Supp.785, 788 (E.D. Ky. 1996) (granting immunity under KRS § 620.030 as "[plaintiffs] have not demonstrated that Dr. Evans lacked 'good faith', or in other words, had bad faith in reporting that Ariel's injuries were consistent with 'Shaken Baby Syndrome' and thus was possibly an abused child"); *Garrison v. Leahy-Auer*, 220 S.W.3d 693, 700 (Ky. Ct. App. 2006) (finding statutory immunity for doctor because, in part, "[i]n this case there is no allegation that Dr. Leahy–Auer acted in bad faith"). Howard's alleged conduct is

- 24 -

Because the plaintiffs have failed to meet their burden of establishing that the defendants' actions violated their clearly established Fourth Amendment rights, the defendants are entitled to qualified immunity with respect to Counts II-IV.  Thus, all remaining claims are subject to dismissal.

### D.  Statute of Limitations

Alternatively, the adult plaintiffs' claims in Counts II and IV are barred by the one-year statute of limitations.  *See Fox v. DeSoto*, 489 F.3d 227, 233 (6th Cir. 2007) (citing KRS § 413.140(1)).  For § 1983 actions, the statute of limitations begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997).  The Amended Complaint alleges that Joyner initially removed J.B.L. and C.L. from their parents' home pursuant to a voluntary agreement on August 14, 2020.  [Record No. 6, ¶ 53]  The family court subsequently granted temporary custody to J.B.L. and C.L.'s paternal grandparents on August 27, 2020.  [*Id.* ¶ 55] The initial deprivation that "should have alerted the typical layperson to protect his or her rights" and, therefore, the accrual date for the adult plaintiffs' cause of action occurred in August of 2020.  *Eidson v. Tenn. Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). Because the plaintiffs filed their complaint on May 20, 2022, over a year after that accrual date, the adult plaintiffs' claims are time barred.

---

not protected under Kentucky's immunity statute, and so the statute has no bearing on the qualified immunity analysis.

## IV.  Conclusion

The plaintiffs have not pleaded any plausible claim for relief.  Counts II-IV are subject to dismissal as against Joyner because she is entitled to absolute immunity for any claims involving her role in the removal proceedings.  And any claims regarding Joyner's conduct regarding the safety plan are not adequately supported by factual allegations.

The plaintiffs' malicious prosecution claim (Count I) fails because the removal proceedings were not criminal in nature.  Further, both defendants are entitled to qualified immunity with respect to Counts II-IV.  The plaintiffs contend that Howard violated their Fourth and Fourteenth Amendment rights when she conducted a bad faith investigation into J.B.L.'s case, but they have failed to allege with requisite specificity that those rights were clearly established.  Finally, the adult plaintiffs' claims are barred by the one-year statute of limitations.  Because all claims against the defendants are dismissed on alternative grounds, it is unnecessary to reach Howard's federal statutory immunity argument.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     The defendants' motions to dismiss [Record Nos. 10, 11] are **GRANTED**.

2.     This civil action is **DISMISSED** and **STRICKEN** from the docket.

Dated: October 4, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky